# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JUDITH M. HUDSON,

        Plaintiff,

        v.                           Case No. 10-C-0487

UNION SECURITY INSURANCE COMPANY and
MAJOR LINDSEY & AFRICA LLC LONG
TERM DISABILITY PLAN, POLICY 5,200,630,

        Defendants.

---

## DECISION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 16), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 29), AND ORDER DISMISSING CASE

Plaintiff, Judith M. Hudson, filed this lawsuit under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover Long Term Disability ("LTD") benefits under an employee welfare benefit plan established, sponsored and maintained by Major, Lindsey & Africa, LLC ("Major Lindsey"). Shortly after filing the lawsuit Hudson filed a motion for summary judgment. Thereafter, defendants filed their cross-motion for summary judgment. The motions are ready for decision.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at

322-24.  In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive.  *Id.* at 247-48.  "Material" means that the factual dispute must be outcome-determinative under governing law.  *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).  Failure to support any essential element of a claim renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.  To establish that a question of fact is genuine, the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

Because the parties in this case have filed cross-motions for summary judgment, many facts are not contested.  When no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law.  *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996).  Nevertheless, when both parties have moved for summary judgment, each is required to show that no genuine issues of material fact exist, taking the facts in the light most favorable to the party opposing each motion.  If genuine issues of material fact exist, neither party is entitled to summary judgment.  *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

## UNDISPUTED FACTS

Hudson was employed as a Managing Director/Recruiter in the Midwest Offices of Major Lindsey beginning in February 2000.  In the position she engaged in legal recruiting

2

for law firms and corporations. (PPFOF ¶ 5; Def.'s Statement of Proposed Material Facts ("DSPMF") ¶ 9.)

As part of its employee welfare benefit plan, Major Lindsey offered enrollment in the Major, Lindsey & Africa, LLC LTD Plan (the "Plan"), insured by Union Security Insurance Company ("USIC") under Group Long Term Disability Plan Policy No. 5,200,630 (the "Policy") to employees whose annual salary was $50,000 or greater. (PPFOF ¶ 6; DSPMF ¶ 1.) The Plan is governed by ERISA. (DSPMF ¶ 2.)

Hudson was eligible for and enrolled in the Plan, i.e., for coverage under the Policy. (PPFOF ¶ 7; DSPMF ¶ 9.) The Policy provided LTD insurance coverage as follows:

> If you become *disabled* while insured under the *policy*, we will pay long term disability benefits if you satisfy the *qualifying period*. We will continue to pay benefits during your *disability*, but not beyond the Maximum Benefit Period. Any benefits are subject to the provisions of the *policy*.

(DSPMF ¶ 10.) The qualifying period was ninety days. (*Id.*) "Disability" and "disabled" were defined as "mean[ing] that in a particular month, you satisfy either the Occupation Test or the Earnings Test." (*Id.*)

For an employee earning over $50,000, the "Occupation Test" was met when "[a]n *injury*, sickness, or pregnancy requires that you be under the *regular care and attendance of a doctor*, and prevents you from performing at least one of the *material duties* of your regular occupation." (*Id.*) "Material duties," in turn," were defined as "the sets of tasks or skills required generally by employers from those engaged in a particular occupation. One *material duty* of your regular occupation is the ability to work for an employer on a *full-time* basis as defined in the *policy*." (*Id.*) "Full-time" meant working at least twenty hours per week unless the policy stated otherwise. (*Id.*)

3

The Plan provided a monthly LTD benefit of sixty percent (60%) of monthly earnings. Hudson's average earnings were $17,610.00 per month; sixty percent of that amount is $10,566.00. (DSPMF ¶ 8.)

In 2006, Hudson was diagnosed with advancing basilar thumb joint arthritis. (PPFOF ¶ 9.) A January 18, 2007, MRI of Hudson's cervical spine showed "[d]egenerative changes throughout the cervical spine . . . at C6-C7 with moderate effacement of the anterior subarachnoid space and left greater than right foraminal narrowing." (PPFOF ¶ 10; Olson Aff. Exs. at 42.)

Hudson last worked for Major Lindsey on July 2, 2007. (*See* PPFOF ¶ 11.) On July 16, 2007, she underwent a right thumb arthroscopic debridement, carpal metacarpal joint, performed by Dr. Curtis Crimmins. (*Id.*)

USIC received a claim for LTD benefits from Hudson on August 31, 2007. (DSPMF ¶ 11.) Dr. John Roffers, the only physician Hudson identified as having consulted for her claimed disabling condition, executed an Attending Physician's Initial Statement of Disability and attached Hudson's medical records. Dr. Roffers listed Hudson's diagnoses by codes as "other and unspecified disc disorder of unspecified region," "unspecified joint disorder of multiple sites," and "debility unspecified." Dr. Roffers's records revealed that Hudson presented on July 3, 2007, complaining of "an ill-defined abdominal condition," for which she provided no symptoms correlating with a known condition. (*Id.*) He reported that Hudson was to see Dr. Crimmins for arthroscopic basal joint reconstruction on her right hand two weeks later. (*Id.*) Dr. Roffers advised Hudson to take a period of disability after the hand surgery to recover from the surgery and abdominal issues. (*Id.*)

4

Major Lindsey told USIC that it was holding Hudson's position, that Hudson expected her return to work by January 2008, and that it was willing to make accommodations to facilitate her return to work. It sent USIC Hudson's 2006 W-2 statement and job description. (DSPMF ¶ 12.)

USIC determined on September 7, 2007, that it needed pharmacy and medical records from all providers since January 1, 2007, to determine if Hudson's conditions were disabling and met Policy requirements. USIC deferred any claim decision until review of that information and informed Hudson of these requirements. (DSPMF ¶ 13.) On the same day, USIC received an Attending Physician's Initial Statement of Disability executed by Dr. Crimmins, the board certified hand surgeon who performed Hudson's July 2007, surgery, together with Dr. Crimmins' medical records. (DSPMF ¶ 14.) Dr. Crimmins listed Hudson's diagnosis code as "osteoarthrosis localized primary involving hand" and assigned her a severe limitation, but listed no objective findings and mentioned only her subjective symptom of pain in the thumb. (*Id.*)

On September 8, 2007, Hudson emailed USIC a list of her providers and pharmacies; USIC then obtained records from them. USIC referred Hudson's claim to its Clinical Services Department for review. (DSPMF ¶ 15.) Thereafter, Hudson faxed another Attending Physicians Initial Statement of Disability, executed on October 10, 2007, by psychiatrist Dr. Christina Keppel. Dr. Keppel assigned Hudson a severe limitation, listed her principal diagnoses as "anxiety disorder NOS, Dysthymic Disorder and Histrionic and Narcissistic personality traits," assigned a global assessment functioning score of 48, and noted back and neck discs as part of Hudson's DSM-IV axes. (DSPMF ¶ 16; Pl.'s Resp. ¶ 16; Vargo Decl. Ex. 4 at US000608.)

5

On November 2, 2007, Dr. William P. Fleeson, a board-certified occupational and preventative medicine physician and consistent for USIC, reviewed all medical records received to that point to determine Hudson's condition, abilities, and restrictions. According to Dr. Fleeson, the reports and records of the various physicians presented no clear picture about the nature and duration of any restrictions and limitations. (DSPMF ¶ 17.)

Upon inquiry from Dr. Fleeson, a secretary at Dr. Crimmins' office told Dr. Fleeson that upon her review of Hudson's file, Hudson had been seen twice, on October 3 and 17, 2007, since the last medical records forwarded to USIC, and as of the last visit Hudson's right thumb had good range of motion and minimal tenderness. Dr. Crimmins recommended that Hudson return later in the year. (DSPMF ¶ 18; Pl.'s Resp. ¶ 18; Vargo Decl. Ex. 4 at US000598.[1])

Given Hudson's "multiple complaints and reported symptoms from overlapping bodily areas and systems," Dr. Fleeson analyzed each reported potential condition to determine limitations and duration. He listed the start date of her various conditions as well as anticipated return to work dates in accordance with the Medical Disability Advisor (the "MDA"). None of the conditions established a disability lasting long enough to satisfy the ninety-day qualifying period. (DSPMF ¶ 19.) However, Dr. Fleeson noted that there was no specific treatment for osteoarthritis, surgical treatment was a final response for joint destruction, and the MDA indicated that limitations for osteoarthritis could be indefinite in duration. (Pl.'s Resp. ¶ 19; Vargo Decl. Ex. 4 at 600.)

---

[1]Hudson objected to this proposed statement of material fact because a secretary is not qualified to provide medical opinions. The proposed statement has been included to the extent that the report from Dr. Fleeson indicates that the secretary was relaying what was in Dr. Crimmins' medical file, not giving her own opinion or analysis. (*See* Vargo Decl. Ex. 4 at US000598.)

6

In a report of November 2, 2007, Dr. Fleeson observed that as of October 2007, nonphysical conditions identified in Dr. Keppel's records may have had a significant impact on Hudson's abilities. (DSPMF ¶ 20; Pl.'s Resp. ¶ 20; Vargo Decl. Ex. 4 at US000603.) Dr. Fleeson wrote that his overall impression was of

> an individual doing at least acceptably well with respect to her soft tissue and musculoskeletal problems, but whom the documentation indicates is considered by her psychiatrist to be decompensating emotionally and psychologically to the point of being overwhelmed, moderately disheveled in appearance, withdrawn, agitated, and depressed, and under psychiatric cognitive treatment. This strongly suggests that the limiting conditions are not musculoskeletal ones discussed in this review . . . .

(DSPMF ¶ 20; Pl.'s Resp. ¶ 20; Vargo Decl. Ex. 4 at US000604.) As to physical capabilities, Dr. Fleeson concluded that, based on all the evidence, Hudson had "physical capabilities in the Class 2 to Class 3 range," translating into medium and light functional capacities. Dr. Fleeson recommended that USIC obtain records from Dr. Oelke, Hudson's rheumatologist, and neurologist Dr. Franczak and return the file for further review. (DSPMF ¶ 21.)

USIC obtained medical records from Drs. Oelke, Franczak, and Keppel and referred them to Dr. Fleeson for review. (*See* DSPMF ¶ 24.) According to Dr. Fleeson, Dr. Oelke had observed in a visit in August or September 2007 that Hudson's tendonitis pain was out of proportion to the physical examination. (DSPMF ¶ 25; Pl.'s Resp. ¶ 25.)

On November 19, 2007, Hudson underwent a right basilar thumb joint arthroplasty, also performed by Dr. Crimmins. (PPFOF ¶ 12.) Thereafter, she reported that the November 19, 2007, surgery was unsuccessful in alleviating the pain in her thumb. (PPFOF ¶ 13; Olson Aff. Exs. at 45-51.) Subsequently, Dr. Fleeson called Dr. Crimmins' office and spoke with the secretary, who told him that the surgery "went without

7

complications" and Hudson was in a splint. (DSPMF ¶ 25; Pl.'s Resp. ¶ 25; Vargo Decl. Ex. 4 at US000527.)

Dr. Fleeson concluded in an addendum to his report that his opinions remained unchanged by the recent information, except that Hudson's right thumb surgery had occurred and she was doing well following the most recent postoperative visit. He suggested that Dr. Keppel's records and Dr. Oelke's report of Hudson's excessive pain symptoms be referred to USIC's Behavioral Health Department. (DSPMF ¶ 26.)

By mid-December 2007, a number of telephone calls between USIC and Major Lindsey occurred discussing the length of time it was taking to determine the claim. (*See* DSPMF ¶ 27; Pl.'s Resp. ¶ 27[2]; Vargo Decl. Ex. 1 at US00083.) On December 18, 2007, the Plan administrator approved Hudson for LTD benefits commencing October 1, 2007. (Olson Aff. Exs. at 36-37; *see* PPFOF ¶ 14; Def.'s Resp. ¶ 14.) However, the administrator said that the Plan needed additional information and that although the claim was being paid at that point, "future liability remains unclear." (Olson Aff. Exs. at 36.) The administrator told Hudson that for the Plan to determine future benefits Hudson was required to participate in a Functional Capacity Evaluation ("FCE"). (*Id.*; *see* Def.'s Resp. ¶ 14; Vargo Decl. Ex. 1 at US000083.) USIC's notes show that considering the length of time the claim had been in-house for review, it would "accept[] liability at present, sending

---

[2]In response to defendants' proposed statement 27, Hudson objects that the proposed finding of fact violates Civil L.R. 56.2(a)(2) because the paragraph was not limited to a "single factual proposition." The local rules were amended in January 2010 (before this case was filed), and the rule regarding a single factual proposition was amended and renumbered. The new version of the rule applies to this case. (The rules were amended again in November 2010, though the changes were minor.) Now, Civil L.R. 56(b)(1)(C) indicates that the statement of proposed material facts (i.e., what used to be called "proposed findings of fact") "shall consist of short numbered paragraphs." Although defendants sometimes push the boundaries of what constitutes a "short" paragraph, the objections referencing the old rule are overruled, as the "single fact" language cited does not apply.

clmt for 2-day FCE . . . . Current pay thru date set at 01/01/08." (DSPMF ¶ 28; Pl.'s Resp.

¶ 28; Vargo Decl. Ex. 2 at US000286.)  In a letter dated December 19, 2007, USIC told

Hudson that despite its "need of additional information[,] [a]s discussed on our phone

conversation on 12/18/07, we will pay the claim to current, but future liability remains

unclear."  The letter told Hudson that if she did not participate to the best of her ability at

the FCE, USIC would not be able to clearly determine her physical capacity to consider or

provide further benefits.  (DSPMF ¶ 29.)

On December 21, 2007, USIC faxed Dr. Crimmins a form inquiring if Hudson was

medically stable enough to undergo an FCE.  Dr. Crimmins returned the form in early June

2008, authorizing Hudson's participation in the FCE.  (DSPMF ¶ 30; Pl.'s Resp. ¶ 30.)

Meanwhile, USIC continued to evaluate Hudson's claim for possible psychiatric

limitations, and on January 2, 2008, Dr. Mike Jones of USIC's Behavioral Health Services

Department conducted a complete review of Hudson's file regarding possible mental or

nervous limitations.  Reviewing Hudson's neuropsychological testing results, Dr. Jones

observed that

> [i]ndividuals with this profile present with extreme somatic problems or
> chronic pain. They complain of being physically ill. They become overly
> concerned about health and bodily functions and overreact to minor physical
> functions. Individuals with this code type are usually diagnosed with
> hypochondrical, depressive, or anxiety features.  They tend to have a poor
> prognosis for traditional therapy.  They resist psychological interpretations of
> their symptoms.  Treatment gains, if they occur, are typically short-lived.

(DSPMF ¶ 31.)  Dr. Jones noted that Dr. Keppel's diagnosis of histrionic and narcissistic

personality traits, "would tend to complicate [Hudson's] recover[y] [but] they would most

likely not be limiting since she had functioned her entire adult life with them."  Dr. Keppel's

finding that Hudson was "somatically preoccupied," accorded with the findings of several

of Hudson's evaluating physicians, according to Dr. Jones.  Dr. Jones contacted Dr. Keppel in a call on January 7, 2008.  Dr. Keppel confirmed that she had not seen Hudson since November 15, 2007, after which Hudson had been pursuing "alternative treatment" for her physical condition.  When Dr. Jones asked about somatization issues, Dr. Keppel replied that "[w]hen a patient tells me they are in pain they must be in pain."  (Vargo Decl. Ex.3 at US000483.)  Dr. Jones concluded that because Hudson had not seen Dr. Keppel since November 2007, was taking no psychotropic medications, and was pursuing homeopathic treatments, he could not determine any psychiatric limitations past November 2007. (DSPMF ¶ 32; Pl.'s Resp. ¶ 32; Vargo Decl. Ex. 3 at US000483.)

On January 28, 2008, USIC conducted an assessment of Hudson's file which noted that postsurgical limitations on Hudson's right hand might be ongoing; the assessor recommended obtaining a supplemental report from Dr. Crimmins.  Based on the assessment, USIC decided to issue payment to Hudson for the January 2008 benefit month and to follow up with Dr. Crimmins in mid-February concerning Hudson's status. (DSPMF ¶ 34.)  That same day, USIC told Hudson that it would only continue to support disability based on her hand condition and that after a supplemental report of her condition in mid-February USIC would try to decide if she could return to work or if USIC would proceed with the FCE.  (DSPMF ¶ 35.)

Hudson told USIC by email on January 31, 2008, that it was "suspected" that she had developed a nerve condition and Dr. Crimmins had referred her to an anesthesiologist/pain specialist, Dr. Steven Donatello, for evaluation.  (DSPMF ¶ 36.)

In April 2008, USIC obtained updated medical records from Dr. Crimmins.  (DSPMF ¶ 37; Pl.'s Resp. ¶ 37; Vargo Decl. Ex. 1 at US000187.)   The records included Dr.

Crimmins' conclusion that by January 9, 2008, Hudson's subjective complaints of pain in her thumb were pain behaviors unrelated to the surgical result or any other known anatomical malady.  Dr. Crimmins recorded that Hudson's complaints of pain "greatly exceed her physical appearance," and that Hudson "clearly has some pain behavior that may require chronic pain professionals."  (DSPMF ¶ 38; Pl.'s Resp. ¶ 38; Vargo Decl. Ex. 3 at US000452.) On February 13, 2008, Dr. Crimmins wrote to Dr. Donatello that, following clinical examination, Hudson's "thumb arthroplasty was looking exceptionally good," expressed his confidence "that her mechanical issues at the base of her thumb are resolved," said he could not "explain her pain in an anatomic way based on [his] knowledge of the post surgical changes and her description of her pain," and set forth in his conclusion that "we will be unable to anatomically explain her pain going forward."  (DSPMF ¶ 38; Pl.'s Resp. ¶ 38; Vargo Decl. Ex.3 at 467.)

Following clinical examination on April 2, 2008, Dr. Crimmins found that Hudson had "no pain with aggressive loading of the CMC joint arthoplasty space, there is no tendonitis, there is no obvious deformity, mass affect, crepitation of the joint of limitation of range of motion.  In short, objectively, it is a totally normal hand.  She has subjective complaints of pain." (US000450) (emphasis supplied).  Dr. Crimmins discharged Hudson from his care on that date.  (DSPMF ¶ 38; *see* Pl.'s Resp. ¶ 38.)

Dr. Fleeson again reviewed Hudson's file, including the additional records from Dr. Crimmins, and reported his findings in an April 29 addendum to his prior reports.  (DSPMF ¶ 39; Pl.'s Resp. ¶ 39.)  The addendum describes a telephone conversation between Drs. Fleeson and Crimmins on April 29, 2008:

11

> [T]he AP stated in numerous ways that this claimant has "significant chronic pain behavior without objective signs of a problem" (his wording) and that he is unable to figure out why she perceives that she cannot perform in a job. He relates that he has "no answer for the question of why she can't perform". The AP stated he believes that the claimant does really "believe she is disabled and her arm is disabled", noting that "She says when she uses her hand that it hurts". He stated "I believe it is more a psychological chronic pain behavior problem" and he has no anatomic, orthopedic, or pathophysiologic explanation for why she feels she cannot do things -- only her reports. He states that the claimant feels strongly she cannot do the work she used to do, but he has no explanation of that perception from his knowledge of orthopedics, the procedure performed, her examination, etc. He repeated that the examination demonstrated a totally normal hand.
>
> As to recommendations for work activities, the AP stated that with respect to the right hand, and based entirely on her symptoms but not substantiated by any objective findings, she probably should not be involved with highly repetitive forceful gripping, grasping, pinching, etc, and again added "But I don't know why". As to performing interviews with prolonged writing, the AP expected the claimant will likely report that she cannot tolerate it but he cannot come up with an anatomic explanation for such symptoms. He did not see any reason that she would not be able to use a keyboard, or write, for less-than-prolonged periods. Dr. Crimmins pointed out that individuals do successfully go back to even significant physical activity after these procedures.

(DSPMF ¶ 40; Pl.'s Resp. ¶ 40; Vargo Decl. Ex. 3 at US000435-36.) Dr. Fleeson, taking into account the MDA and Hudson's file, opined that the maximum recuperation for basilar thumb joint arthroplasty would be about forty-two days for sedentary and light work. (Vargo Decl. Ex. 3 at US000436; *see* DSPMF ¶ 40; Pl.'s Resp. ¶ 40.)

Dr. Fleeson's review prompted USIC to redouble efforts to schedule an FCE and ask the USIC vocational department for input. USIC's vocational department reviewed Hudson's job description from Major Lindsey, consulted standard occupational reference materials, including the U.S. Department of Labor's Dictionary of Occupational Titles, and concluded that Hudson's occupation fell within the occupational group of Human Resources, Training, and Labor Relations Specialists (SOC. 13-107), which encompasses

12

the occupation of Personal Recruiter (DOT Code 166.267-038). USIC listed the material duties of Hudson's occupation and determined that the occupational demands in this occupation are sedentary and light. (DSPMF ¶ 42.) Also, the vocational department assessed whether any devices might assist Hudson in avoiding prolonged handwriting and concluded that three devices—a RingG-Pen, a tape recorder and a one/two handed combo keyboard—could assist. (*Id.*)

A June 12, 2008, Nerve Conduction & EMG Report performed on Hudson showed "electrophysiological evidence . . . suggestive of a right C5 radiculopathy, with evidence of ongoing denervation." (PPFOF ¶ 15.) The report also stated that there was "no convincing electrophysiologic evidence of upper extremity mononeuropathy at this time" and that "[b]ilateral median and ulnar motor conduction studies were normal. Bilateral median, ulnar and radial sensory studies were essentially normal." (Def.'s Resp. ¶ 15; Olson Aff. Exs. at 57.)

After Hudson received a call about scheduling the FCE, she contacted USIC on June 26, 2008, and attempted to reschedule it, to await further medical developments. In the end, Hudson agreed to call about scheduling the FCE, but also explained that she wanted "to get a second opinion on the hand, but haven't had the opportunity to do so." (DSPMF ¶ 43; Pl.'s Resp. ¶ 43.) A letter dated June 27, 2008, told Hudson that a two-day FCE was scheduled for July 21 and 22, 2008.

Meanwhile, USIC hired a vendor to conduct video surveillance on Hudson. Surveillance occurred on July 1, 2, 22, 23, and 24, 2008—before, during, and after the FCE. (DSPMF ¶ 44; PPFOF ¶ 16.) Copies of the DVD surveillance videos were placed in the USIC claim file, as were the surveillance reports. (DSPMF ¶ 44.)

13

The July 1 surveillance report revealed that Hudson drove herself and her children on three trips away from home, two of which were round trips of about ten miles to a park and high school complex. On the third trip, she and two children exited Hudson's car. Hudson was videotaped for more than thirty minutes sitting on a wooden gymnasium floor in various positions talking to two other women and normally arising from her sitting position. (DSPMF ¶ 46.)

The surveillance video footage from July 1 and 2 and July 22 and 23, 2008, was submitted to and has been viewed by the court. In recounting its observations of the surveillance videos, the court does not attempt to make any medical diagnosis. Instead, it is merely comparing what the lay eye sees against how the medical reviewers describe the videos.

In the court's view, the video from July 1, 2008, shows Hudson sitting for more than thirty minutes on a gymnasium floor. She adjusted position several times to lean against bleachers, but for the majority of the footage she sat upright and often cross-legged on a gym floor. In the footage, Hudson talked, often using both hands animatedly for expression, generally using her right hand as much as her left. Hudson rested her chin on her right hand, appeared to tie a shoe using both hands, held her children's shoes with her right hand, and pulled at and straightened her shorts with both hands. To the court's eye, she exhibited no wincing, even when resting her chin on her right hand, though at one point it appeared she was cradling her right lower arm in her left. After rising from the floor without apparent difficulty, Hudson walked without apparent stiffness and carried a purse over her shoulder. (*See* Doc. 27.)

14

Hudson underwent an FCE on July 21 and 22, 2008. The FCE report concluded that she was "functioning at a level below her reported job demands for her occupation as Recruiting Attorney." It also found that Hudson "is not able to tolerate an 8 hour work day due to limited tolerance to prolonged static postures, decreased strength, and function of her right hand, and deficits with cervical range of motion." (PPFOF ¶ 17; DSPMF ¶ 45.) The report noted that Hudson was driven by a family member to the FCE appointment. The evaluators observed on a number of occasions in connection with tolerance testing for standing, sitting and reaching, that Hudson had to rest her head against a wall or "lay supine" between tests. She "required a 13-minute rest break in supine after material handling testing on Day 1 of testing secondary to cervical symptoms." Hudson complained of left hand pain during the examination. According to the evaluators, Hudson cried after testing, reported feeling "miserable," had a migraine with subsequent vomiting, was unable to tolerate sitting upright, experienced unsupported secondary neck pain, had pain on the right lasting a few hours, and had an onset of left hand pain. Hudson described her then-current status as "the worst I have ever been. It is constant and unrelenting." (DSPMF ¶ 45; Pl.'s Resp. ¶ 45.)

The surveillance report for July 22, 2008, indicated that Hudson was driven to and from the second day of the FCE. However, that afternoon she drove to and from a school to pick up her children attending day camp. After arriving home, Hudson and her children donned swim attire and she walked them to the aquatic building of the Karl Jewish Center,

where they remained in excess of an hour until surveillance was discontinued. (DSPMF ¶ 46; Pl.'s Resp. ¶ 46.[3])

To the court, in the footage from July 22, 2008, Hudson held a cell phone with her right hand initially but then held the phone to her left ear with her left hand. She appeared to walk without any problems. In footage following FCE, Hudson wore a black splint on her right hand and wrist. Hudson carried a purse over her left shoulder, held her children's hands in each of hers, opened a car door with her left hand, and drove. Later, when walking (apparently to the pool), she carried her purse over her right shoulder and walked smoothly, though slowly. (*See* Doc. 27.)

USIC referred the FCE Report and surveillance videos to Dr. Fleeson for review. In an addendum dated August 20, 2008, Dr. Fleeson noted various aspects of pain behavior reported in the FCE and discussed the surveillance footage as follows:

> The main portion of the video was of the claimant sitting on a gymnasium floor, sitting cross-legged, talking with another person. She sat cross-legged on the floor for greater than a half hour, and during this time she was generally animated, gesturing with both upper extremities equally, gesturing with neck and torso, etc all without any presentation that would cause any observer to suspect any physical difficulty at all. I observed no awkwardness of motion, stiffness, lack of hand/wrist motion, shaking out or rubbing a hand or thumb, or anything out of the ordinary. I observed on the entire tape absolutely nothing other than a normal individual sitting, obviously comfortable and never stiff or awkward, never stretching to change positions or relieve stiffness, laughing, talking, gesturing, and eventually getting up. The hands, arms, neck, torso and eventually lower extremities appeared to be held, and to function, exactly like any normal person's would be held or functioning. There was nothing to suggest an injury or limitation of any sort of any observable body part.

---

[3]Hudson says she disputes these proposed facts, but her dispute goes to her explanation of what surveillance revealed rather than a dispute about what surveilling investigators saw or what the videos actually show. In other words, she does not dispute that she was seen driving or taking children swimming, but rather whether those things support USIC's denial of benefits in the face of her explanations. That is argument, not a disputed fact.

16

At one point the claimant leaned back, sort of reclining, and was resting on her right upper extremity. During this time she was gesturing as fully and as animatedly with the left upper extremity as before with both. She remained talking, gesturing, turning head and neck, laughing occasionally, etc. I saw no limitation of motion of upper extremities, including shoulders, elbows, or wrists. Eventually the claimant picked up her purse, put it over her left shoulder, and got up, all with fully normal motions. The arising from cross-legged sitting on a bare floor to standing was fluent without any trace of awkwardness, slowness, or stiffness. She adjusted her clothing, using both hands as would anyone, to tug down the hems of her shorts (this was a pinch-type action, using both right and left hands). She ambulated (with children) fully normally, and exited the building. The tape showed her walking on the sidewalk, also normally.

The later portion of the video showed the claimant standing around talking, using a cell phone. She was later walking normally, purse over the left shoulder, carrying some object in the right hand. She opened and entered a vehicle and apparently drove it away. In the final portion of the video, she was again ambulating, this time carrying the purse on the right. I observed no limp or antalgic stance or gait or station.

(DSPMF ¶ 47.[4])

Dr. Fleeson noted Dr. Crimmins' observation that the surgical procedure he performed on Hudson "essentially universally results in return to excellent function, even to heavy work," as contrasted with Hudson, who reported continued severe pain, complained of incorrectly performed surgery, and expressed a need for injections and other related procedures. Regarding the FCE, Dr. Fleeson observed that the FCE staff recorded numerous behaviors that were contradicted by the observed behavior on the surveillance material:

inability to use the right hand, needing to lean her head against the wall after a short period of standing, avoiding even using the right hand to drink from

---

[4]Again, Hudson says she disputes the facts in this paragraph, but what she disputes is what the facts mean, in argument. For instance, she says "that Dr. Fleeson's interpretation of the activities caught on tape during the surveillance present an inaccurate view of Ms. Hudson's FCE findings." (Pl.'s Resp. ¶ 47 at 35.) And she argues that her use of a cell phone is not inconsistent with the FCE findings. (*Id.* at 38.) Dr. Fleeson said what he said—those are facts. Contentions about whether he was right constitute argument.

17

a water bottle, etc. The video surveillance material absolutely showed that none of these pain behaviors were present. The video also showed, to any objective and discerning clinical observer, physical activities that could not be performed if chronic physical conditions such as the claimant describes and of the severity that she describes to the extent she describes, were present and existed at the time period that she describes.

. . . . In other words, the surveillance refutes, contradicts, and makes the claimant's complaints appear to have no conceivable basis in any known medical condition. The observed time sitting, for example, completely contradicts the claimant's own statements about her sitting tolerance.

(DSPMF ¶ 48.) Dr. Fleeson wrote that while "the FCE may have been internally valid, [it] is not at all congruent with the rest of the medical documentation. The FCE staff reported what they observed, and I find no physical basis for those observations except the claimant's behavior during the FCE." In conclusion, Dr. Fleeson found no medical support for any ongoing physical restrictions. (DSPMF ¶ 49.)

USIC conducted an Eligibility for Continuing Benefits Assessment on August 26, 2008, which included a review of Dr. Fleeson's most recent evaluation, the FCE report, and surveillance materials. USIC decided to deny Hudson's LTD benefits after August 30, 2008 (DSPMF ¶ 50) and notified her in a letter dated August 27, 2008 (PPFOF ¶ 18; Def.'s Resp. ¶ 18; Olson Aff. Exs. at 77-83).

The letter summarized the medical information contained in the file as reported by Dr. Fleeson and the conclusions contained in the FCE report. The summary of medical information included discussion of records from Dr. Oelke regarding left shoulder pain, thumb pain, neck and hip issues. (Olson Aff. Exs. at 78.) Then, USIC expressed its view that the surveillance material contradicted the FCE report:

We videotaped your daily activities on 7/1/08 and also some time on 7/22/08. You were seen on 7/1/08 sitting on a gymnasium floor, sitting cross-legged, talking with another person. You sat cross-legged on the floor

18

for greater than a half hour, which doesn't correspond with what you said on the day of the FCE regarding the no sitting for greater than 15 minutes. During this time, you were generally animated, gesturing with both upper extremities equally, gesturing with neck and torso, etc without any presentation that would cause any observer to suspect any physical difficulty at all. We observed no awkwardness of motion, stiffness, lack of hand/wrist motion, shaking out or rubbing a hand or thumb, or anything out of the ordinary. We observed on the entire tape absolutely nothing other than a normal individual sitting, obviously comfortable and never stiff or awkward, never stretching to change positions or relieve stiffness, laughing, talking, gesturing, and eventually getting up. The hands, arms, neck, torso and eventually lower extremities appeared to be held, and to function, exactly like any normal person's would be held or functioning. There was nothing to suggest an injury or limitation of any sort of any observable body part.

. . . .

On 7/22/08, you were standing around talking, using a cell phone with the right hand and fingers. Later you walked normally, purse over the left shoulder, carrying some object in the right hand. You opened and entered a vehicle and drove it away. This action of driving doesn't correspond to what you stated on the day of the FCE, you couldn't drive. In the final portion of the video, you were again ambulating, this time carrying the purse on the right. We observed no limp or antalgic stance or gait or station.

The FCE reported that your observed capacities were in the less-than-sedentary category. However, the FCE staff also recorded numerous behaviors that are contradicted by the observed behavior on the surveillance material: inability to use the right hand, needing to lean your head against the wall after a short period of standing, avoiding even using the right hand to drink from a water bottle, etc. The video surveillance material showed that none of these pain behaviors were present. The video also showed, physical activities that could not be performed if chronic physical conditions such as you described and any of the severity that you described, to the extent that you described, were present and existed at the time period that you described.

Dr. Fleeson concluded that, the surveillance material refutes, contradicts, and makes your complaints appear to have no basis in any known physical medical condition. The observed time sitting, for example, completely contradicts your own statements about your sitting tolerance. There is no medical support for any ongoing physical restrictions, based on our recent investigation.

19

For these reasons you do not satisfy the Occupation Test and do not meet the definition of disability.

(DSPMF ¶ 51; Olson Aff. Exs. at 81-82.[5])  The letter included the pertinent Policy provisions and USIC's summary of Hudson's material job duties.  Addressing Hudson's claims regarding her inability to meet her job demands, USIC wrote:

> You have reported that when you do interviews for longer than an hour you develop pain in your hand due to writing.  Dr. Fleeson's physician review (below) indicates that by April 2008 your restrictions and limitations would have been to avoid prolonged handwriting (3-5 hours total in an 8-hour day) due to your thumb condition.  Your employer has not provided any documentation that your job would require handwriting in excess of this amount.  However, our vocational department found some devices to assist with the handwriting restrictions/limitations . . . .

(Olson Aff. Exs. at 78.)

According to a December 3, 2008, letter to Hudson, USIC denied Hudson's claim for the waiver-of-premium benefit (called the "Life Disability Benefit") that continues group life coverage during disability.  The "disability" as defined for the Life Disability Benefit requires inability to perform "the material duties of *any* occupation for which your education, training, or experience qualifies you."  The Policy for LTD benefits, on the other hand, requires only an inability to perform "the material duties of *your* regular occupation." (DSPMF ¶ 86 (emphasis added).)  As USIC told Hudson in its December 3, 2008, letter, it was denying her claim for the Life Disability Benefit because Hudson was capable of performing occupational duties of her regular occupation, a finding that necessarily precluded entitlement to the Life Disability Benefit as well.

_____

[5]As with several other responses to defendants' proposed statements of fact, Hudson objected to proposed statement 51 with argument.

After the second hand surgery performed by Dr. Crimmins, Hudson had sought the opinions of two other surgeons, Drs. Eric Gaenslen and Roger Daley. Hudson was interested in surgery and both surgeons suggested a third surgery. (PPFOF ¶ 29; Def.'s Resp.; Olson Aff. Exs. 51, 84.) On November 17, 2008, Hudson underwent a right radial sensory nerve decompression at the right wrist, and right basal thumb joint tendon interposition arthroplasty surgery. The surgery was performed by Dr. Gaenslen. (PPFOF ¶ 20.) Hudson attended occupational therapy from late January 2009 through March 2009. (PPFOF ¶ 22; Def.'s Resp.; Olson Aff. Exs. at 106-28.) Hudson was released from occupational therapy on March 31, 2009, with the following limitations: "functional limitations of pain associated with pinching and with weightbearing on her right hand, in particular writing." (PPFOF ¶ 24; Olson Aff. Exs. at 126-28.)

On February 26, 2009, Hudson appealed the termination of LTD benefits as of August 31, 2008. (PPFOF ¶ 21.) Her attorney submitted a nineteen-page letter and additional medical documentation, including records from Dr. Oelke and her pharmacy. (DSPMF ¶ 52; Olson Aff. Exs. at 87-105.) The attorney wrote that USIC's job description underestimated how large a role interviewing applicants played in Hudson's job. USIC's conclusions about the surveillance video were disputed with detailed explanations about what the videos showed and discussion of why Hudson's actions on the videos did not support denial of benefits. (Olson Aff. Exs. at 93-104.)

USIC obtained medical records from a Dr. Shafer and sought to obtain an independent medical peer review of medical data in the file plus contact with Drs. Gaenslen, Satvinder Dhesi (Hudson's pain management physician), and Crimmins. (DSPMF ¶ 52.)

21

On April 24, 2009, Dr. Patricia Neubauer of USIC's Behavioral Health Services assessed the medical and pharmacy records, FCE report, surveillance information, and appeals letter from Hudson's counsel. Regarding Dr. Keppel's diagnosis of narcissistic and histrionic personality traits, Dr. Neubauer discussed that "[p]ersons with narcissistic personality traits show a pattern of grandiosity, need for admiration, and lack of empathy. . . . Persons with histrionic personalities tend to respond with excessive emotionality and need for attention. The need for attention does not strictly exist in the personal realm but in any functional area, including the workforce." Dr. Neubauer thought that although Hudson's symptoms could "impact[] her ability to cope with chronic pain disorder[, they] would not clearly be a barrier to work requiring significant interpersonal interaction." In sum, Dr. Neubauer found the documentation lacking information sufficient to conclude that Hudson's psychiatric issues alone precluded her from performing occupational duties. (DSPMF ¶ 53.)

Dr. Jerome Siegel, a board-certified occupational medical physician, conducted a complete medical record review, including the FCE report and surveillance data. Dr. Siegel attempted to contact Dr. Gaenslen and left messages four times, but Dr. Gaenslen did not return the calls. However, Dr. Siegel spoke with Drs. Dhesi and Crimmins. (DSPMF ¶ 54.) Dr. Crimmins said the procedure he performed on Hudson had, in over 500 cases, been routinely successful for his patients. Hudson, however, had "continued to have right hand pain despite what appeared to be a technically excellent result on physical exam and follow up," following the November 2007 procedure. Postoperatively, according to Dr. Crimmins, Hudson had "a totally normal hand despite having subjective complaints of pain." Dr. Crimmins had no further recommendations for Hudson and relayed his clinical conclusion

that "most if not all of Ms. Hudson's initial right hand and thumb complaints may have been related to underlying emotional and psychiatric problems." (DSPMF ¶ 55.) Dr. Dhesi agreed that "return to work would be a reasonable goal for Ms. Hudson in some capacity" (DSPMF ¶ 56) and mentioned that Hudson had received steroid injections around the time of the surveillance, which likely made her feel better (Vargo Decl. Ex. 5 at US000735).

In his report of May 4, 2009, Dr. Siegel described the videotape surveillance and found "a clear discrepancy" between what appeared on the FCE and what appeared in the surveillance videos. Noting that Hudson sat for about half an hour in various positions talking with other parents, she appeared

> normal in the video/activity check. She is seen gesturing with both hands in multiple activity clips and appears to have no evidence of pain behavior or difficulty with neck or upper extremities. This is markedly different from the Functional Capacity Evaluation. Given what is documented in the Functional Capacity Evaluation, I am unable to conclude that the FCE represents a valid representation of Ms. Hudson's overall abilities especially given the activity check/video surveillance.

(DSPMF ¶ 58.)

Analyzing whether restrictions and limitations prohibited performance of occupational duties after the initial claim denial date of September 1, 2008, Dr. Siegel observed that while Hudson likely had partial restrictions until her November 17, 2008, surgery, thereafter she would, for a six-week period, i.e., until January 1, 2009, have required a period of time out of work. Beyond that, said Dr. Siegel, "there is no objective medical substantiation that she would be unable to perform her regular sedentary to light physical demand work activities doing administrative work as a management recruiter from 1/1/2009 forward to the present day, 4/30/2009." As of the beginning of 2009, there existed no "specific substantiation of physical restrictions" that would prohibit Hudson in

23

her ability to perform handwriting and keyboarding activities. (DSPMF ¶ 59.[6]) Dr. Siegel opined that he saw no indication that Hudson's use of three Percocet pills per day caused side effects or impairment of her abilities. (DSPMF ¶ 60; Pl.'s Resp. ¶ 60; Vargo Decl. Ex. 5 at US000745.)

Two days after Dr. Siegel completed his report, Hudson sent USIC additional diagnostic imaging reports. (DSPMF ¶ 61.) The report of an April 17, 2009, MRI of the cervical spine indicated "[s]table multilevel degenerative changes. Unchanged mild disc osteophyte complexes from C4-C5 through C6-C7 result in mild central canal narrowing." In addition, the report noted "[m]ild foraminal narrowing at multiple levels, moderate C6-C7 left foraminal narrowing." (Olson Aff. Exs. at 139; *see* PPFOF ¶ 25; Def.'s Resp. ¶ 25.) An April 17, 2009, CT-Scan of the cervical spine showed broad-based disc bulging at C4-C5, with a possible shallow right central disc herniation; multilevel spinal canal narrowing, which is mild to moderate at C5-C6 and C6-C7; and multilevel degenerative disc disease. (PPFOF ¶ 26; Olson Aff. Exs. at 132.)

On May 11, 2009, USIC's appeal examiner sent Dr. Siegel the additional diagnostic studies and some additional records received from Dr. Keppel. Dr. Keppel's records were also sent to Dr. Neubauer. The examiner noted that Dr. Keppel's records mentioned that Hudson was starting her own recruiting business and had a website; the examiner directed USIC's investigative services unit to look into the matter. (DSPMF ¶ 62.)

---

[6]Hudson objects to this proposed statement of material fact by pointing to a November 27, 2009, letter from Dr. Gaenslen, in which Dr. Gaenslen states his opinion that Hudson would not have been able to return to work until August 17, 2009. However, Dr. Siegel's report says what it says, so the proposed statement has been accepted, regardless of whether Dr. Gaenslen's opinion differed.

24

On May 21, 2009, Dr. Neubauer produced an addendum after considering the updated records. Reviewing Dr. Keppel's note of 4/20/09, Dr. Neubauer noted that Hudson "has less complaints of pain." Dr. Neubauer found that by January 2009, Hudson's condition stabilized and she was being seen on a maintenance basis only every three months, plus she was discussing returning to work by February 2009. Thus, according to Dr. Neubauer, the medical documentation revealed that after September 2008, there was no clinical mental health documentation to support occupational restrictions. (DSPMF ¶ 66.)

On May 21, 2009, Dr. Siegel completed an addendum after analyzing the additional diagnostic reports and records. Comparing the April 2009, MRI with cervical spine MRIs performed on Hudson in 2007, Dr. Siegel concluded that the new studies "do not demonstrate specific changes or deterioration in her overall condition." Thus, the new information did not "reflect the need for additional physical restrictions or physical limitations or changes" from his May 4, 2009, report. (DSPMF ¶ 67.)

The investigation into Hudson's new business revealed that Hudson owned JMH Legal Search, LLC. Wisconsin public records showed that the entity was created effective March 6, 2009, and Hudson was listed as the registered agent. An internet search located the website www.jmhlegalsearch.com, on which Hudson informed the public that she "specializes in finding talented lawyers for leading companies and law firms throughout the Midwest and beyond." (DSPMF ¶ 63.)

When USIC followed up on Hudson's new business and other return to work endeavors, Hudson responded with an affidavit on June 24, 2009, in which she said she sought part-time work from Major Lindsey and that she had not yet earned income from

her new business. However, at that point she had set up her own website, registered her business entity as an LLC, ordered and secured business cards, sent emails and made telephone calls to her personal contacts, and sent out thirty to forty marketing letters. (DSPMF ¶ 64.)

Hudson underwent chiropractic treatments in 2009 with Karl A. Lickteig.

On June 24, 2009, Dr. Siegel produced another addendum, taking into account additional records Hudson had submitted from Drs. Block and Ziegler, as well as diagnostic imaging studies. According to Dr. Siegel, the most recent studies did not demonstrate specific changes or deterioration in her overall cervical condition and the reports from Drs. Block and Ziegler did not reflect the need for additional physical restrictions or limitations. Nor did the additional information submitted for review alter his opinions. As to any left shoulder condition, there was "no indication that she requires urgent or emergent left shoulder surgery." (DSPMF ¶ 65.)

On July 8, 2009, USIC assessed Hudson's appeal and concluded that while Hudson had restrictions associated with Dr. Gaenslen's surgery in the fall of 2008, those restrictions did not continue past December 31, 2008. USIC decided to award benefits to December 31, 2008, but affirmed the denial of benefits after that date. (DSPMF ¶ 68.)

USIC notified Hudson in a seven-page letter dated July 8, 2009. The letter listed the information that had been reviewed: medical records from Drs. Roffers, Galezowska, Crimmins, Aschliman, Keppel, Oilke, Franczak, Chang, Dhesi, Gaenslen, Block and Ziegler; medical records from physical therapy and the chiropractor, Dr. Lickteig; records from Dr. Schaefer; the MRI, CT scan, and xrays from April 2009; pharmacy records; reviews by Drs. Fleeson and Siegel; reviews by a registered nurse; reviews by

26

psychologists Jones and Neubauer; the FCE; information from the investigation services unit; and reviews by certified rehabilitation counselors at USIC. The letter then noted that Hudson's job fell within the occupation of human resources, training, and labor relations specialist, and listed the material duties of her occupation as

1. . . . being able to work for an employer on a full-time basis, as defined in the policy. . . .
2. Review and/or evaluate information such as job positions, applicant qualifications, job orders, selection and testing techniques, training materials, and/or recruitment and selection criteria.
3. Acquire and maintain knowledge of occupational requirements, occupational qualifications, industry practices, and/or benefits.
4. Communicate with managers, instructors, employers, employees, and/or prospective employers or employees.
5. Maintain and/or prepare records or reports.

(Vargo Decl. Ex. 2 at US000226-US000227.) USIC summarized the medical information, the finding in the FCE conducted in July 2008, and the surveillance videos.

In approving the additional benefits, the administrator noted that Dr. Siegel stated that as of September 1, 2008, he could not conclude that Hudson could work a forty-hour week "given her ongoing complaints of pain, need for follow up in the multi-disciplinary pain clinic with Dr. Dhesi, ongoing need for narcotic medication and ultimately requiring additional right thumb surgery with Dr. Gaenslen" and that from September 1 until six weeks post-operation, or January 1, 2009, Hudson would have had limitations on the use of her right hand and thumb in performing repetitive keyboard activities and handwriting. (PPFOF ¶ 27; Def.'s Resp.; DSPMF ¶ 69; Olson Aff. Exs. at 133, 138.)

However, the Plan administrator concluded that Hudson should have been physically capable of performing full time sedentary to light physical demand activities as of January 1, 2009. (PPFOF ¶ 28.) USIC outlined Dr. Fleeson's clinical observations with

27

respect to Hudson's pain behavior conveyed to the evaluators at the FCE with her actions and behavior captured on the surveillance video. USIC noted the discrepancy between what Dr. Crimmins observed between his clinical findings of Hudson and the self-reported pain behaviors for which he could find no physiological explanation. USIC summarized the assessments of Hudson's file from Drs. Siegel and Neubauer and set out those doctors' conclusions that the file materials, as a whole, did not support physical or psychiatric restrictions that would impair Hudson's performance of occupational duties from January 2009 forward. As Hudson no longer met the definition of disability contained in the Policy as of that date, the Plan administrator terminated her benefits effective December 31, 2008. (DSPMF ¶ 69; PPFOF ¶ 29.)

USIC's denial letter acknowledged Hudson's appeal letter and that she had provided additional medical records from treating physicians. The administrator indicated that she obtained updated records and, that as part of the appellate review, she had requested the independent medical review by Dr. Siegel as well as the review by the behavioral health department. (Olson Aff. Exs. at 138.) USIC's letter advised Hudson that she could appeal the denial to USIC's Disability Appeals Committee, which was the final level of review available. (*Id.* at 139-40.)

By letter dated July 23, 2009, USIC was notified that Hudson was appealing the July 8, 2009, denial. USIC requested that counsel forward any information Hudson desired to add and that Hudson submit a statement of information concerning her income received from other sources. (DSPMF ¶ 70.)

A November 5, 2009, MRI of Hudson's left upper extremity showed a "valgus/extension injury with chondromalcia involving the capitellum and associated partial

28

detachment of the deep undersurface fibers of the ulnar collateral ligament at its insertion site on the coronoid process" and "common extensor tendinopathy/partial tear." (DSPMF ¶ 30.) In addition, Dr. Gaenslen stated in a letter dated November 27, 2009, that Hudson's recovery from the surgery she had on November 17, 2008, "is typically a long one with gradual and slow increases in endurance, comfort and strength. Commonly a period of 9-12 months is typical for recovery." He referenced therapist notes of pain associated with pinching and with weightbearing on her right hand. He then opined:

> Ms. Hudson certainly would not have been capable of returning to work performing significant periods of writing as of January 1, 2009. Any typing that she would have been doing by that time would have been one-handed with some assistance with the operative hand. Therefore, any work activities she could have done as soon as January 1, 2009, would have been on an extremely limited and unproductive basis.

> My understanding of her prior occupation as managing director and recruiter of a large search consultant company was such that she would not have been able to perform the duties of that position. Based upon my understanding of her occupational requirements in terms of writing, I estimate that it would be approximately nine months from the time of her surgery before she could resume that level of endurance with a tolerable level of comfort. This would be approximately August 17, 2009.

(PPFOF ¶ 31; Def.'s Resp. ¶ 31; Olson Aff. Exs. at 174.)

By thirty-two-page letter dated January 4, 2010, Hudson transmitted her appeal, including numerous additional medical records and a statement that Hudson's company had $13,000 in income. An updated form sent the next day showed earned income of $17,100 in 2009. (DSPMF ¶ 71; Pl.'s Resp. ¶ 71.) By affidavit submitted with her appeal, Hudson admitted that in connection with JMH Legal Search, LLC, she had conducted five legal placement interviews and that she could "sit at the computer and work for 3-4 hours per day." (DSPMF ¶ 72.)

29

In her appeal letter, Hudson argued that she was under the regular care and attendance of Dr. Gaenslen until August 17, 2009, could not perform the material duties of her job and was disabled through that date on the basis of her hand condition. (Olson Aff. Exs. at 144-45.) She contended that Dr. Siegel's conclusion that she could return to work as of January 1, 2009, had no basis in fact and was incorrect. As support for her argument, Hudson pointed to Dr. Gaenslen's November 27, 2009, letter; her occupational therapy through March 2009 and therapists' notes indicating functional limitations of pain associated with pinching and weightbearing on her right hand; Dr. Siegel's failure to explain why he chose January 1, 2009; and Dr. Gaenslen's notes in January 2009, indicating that she had not yet recovered from surgery. (*Id.* at 145-47.) Hudson also pointed to pain specialist records indicating chronic neck pain and shoulder, right hip and left elbow pain, which would not be limited to any end date in August 2009. (*Id.* at 147-48.) Hudson's attorney stated that Hudson's ability to perform tasks such as grasping, pinching, standing, walking, and sitting worsened after the FCE in July 2008. (*Id.* at 155.) In addition, counsel contended that USIC's job description for Hudson was incorrect and did not account for the extensive computer research, typing, writing, and telephone work she did and how large a role interviewing applicants played in her occupation. (*Id.* at 159.) Hudson's counsel noted Policy language indicating that full-time work meant twenty hours per week, but added that though Hudson was working on average between three to four hours on the days she could work, she was unable to work at all on several days due to her medical conditions. (*Id.* at 160.)

By letter dated January 20, 2010, USIC informed Hudson's counsel that her appeal would be reviewed by the Appeals Committee on February 9, 2010, and asked Hudson to

forward evidence of earned income from her current employment. Hudson's attorney complied, forwarding two check stubs reflecting payment to JMH Legal Search, LLC in the sum of $17,100. Counsel also submitted additional medical reports. (DSPMF ¶ 74.)

When the Appeal Committee met on February 9, 2010, to consider Hudson's appeal and the additional medical information, it recommended obtaining another peer review for limitations beyond January 1, 2009, to include records received at and before the final appeal and submitted medical information. (DSPMF ¶ 75.)

USIC retained Dr. Trenton Gause, a board certified orthopedic surgeon and member of the American Association for Hand Surgery, to conduct an independent peer review of Hudson's claim, and Dr. Gause issued his report on March 15, 2010. The report listed the records Dr. Gause reviewed, including Dr. Gaenslen's November 27, 2009, letter, and various occupational physical therapy and chiropractor notes from early 2009, which Hudson had submitted. Dr. Gause addressed Hudson's history of presenting complaints to treating physicians of pain that outstripped findings on physical exam and diagnostic examinations. (DSPMF ¶ 76.) Moreover, Dr. Gause referred to Dr. Gaenslen's postoperative reports in February and April 2009, which found "a good wrist and thumb exam," and to Dr. Gaenslen's testing that was "positive for pain," but "negative for weakness." Additionally Dr. Gause also cited test results that were "negative for weakness" from Dr. Gaenslen in November 2009. (DSPMF ¶ 77.)

According to Dr. Gause, all of Hudson's diagnoses that were active as of January 1, 2009, were based on subjective complaints that had been consistent throughout the medical documentation. But while Hudson continued to complain of shoulder and elbow pain after that time, testing revealed her to have full range of motion of both joints. He

31

stated that Hudson's subjective complaints "appear to be out of proportion to her physical findings . . . [and her] treating physicians felt that she may have had a psychosomatic component." Dr. Gause described Hudson's subjective complaints to be "rather extensive and rather dramatic." (DSPMF ¶ 79.[7])

It was Dr. Gause's view that Hudson displayed a higher level of activity on the surveillance video than she had to the FCE evaluators in July of 2008. He noted that on the surveillance video, Hudson appeared to move about without any effort or apparent discomfort and used her bilateral upper extremity and hands without any apparent effort or discomfort. According to Dr. Gause, those activities were inconsistent with the 2008 FCE. (DSPMF ¶ 80.)

Dr. Gause specifically found that as of January 1, 2009, Hudson could function in at least a light duty capacity. (Vargo Decl. Ex. 8 at US001326.) As of that date there was no "contraindication" that

> she could walk or stand, as well as sit without restrictions. She should be able to lift and carry up to 20 pounds occasionally, 10 pounds frequently. She should be able to perform fine motor movement and fingering without restrictions. She should be able to type or use a computer for at least an hour at a time for a cumulative total of 5 to 6 hours total in an 8-hour day. She should refrain from prolonged repetitive gripping or exposure to vibratory tools, i.e. no more than on an occasional basis. She should refrain from prolonged overhead use of her upper extremities, which would be no more than on an occasional basis for work or reaching overhead. Reaching at and below shoulder is not restricted.

---

[7]Hudson objects to this proposed statement because the emotional or psychological problems Dr. Gause discusses were from a time period when Hudson was found to be disabled and predated her third hand surgery. Hudson's objection (and any other objection similar to it) is overruled. Although Dr. Gause may have pointed to records predating the third surgery, he did so to make the point that her postsurgery complaints were consistent with her presurgery complaints, which were discredited by the videos.

32

(DSPMF ¶ 82; Vargo Decl. Ex. 8 at US001326.)  Dr. Gause concluded that Hudson's functional capacity had not changed since January 1, 2009, and that Hudson could write, perform computer work, and drive within occupational demands.  According to Dr. Gause, these restrictions would be "due to all diagnoses cumulatively." (Id.).

On March 17, 2010, USIC's Appeals Committee reconvened and, considering Dr. Gause's report and all information contained in the file, recommended denial of the claim beyond January 1, 2009, thereby upholding the prior decision on appeal.  (DSPMF ¶ 83.)

By letter dated March 31, 2010, USIC denied Hudson's appeal and refused to pay any further benefits after December 31, 2008.  The letter cited the applicable definition of disability under the Policy and affirmed that the Appeals Committee's review consisted of all information then contained in her claim file.  It again set forth Hudson's occupational duties, the same as had been noted in the July 2009 denial.  The letter added:  "The Committee reviewed your contentions about other duties of her occupation, but determined that those duties were not material duties of the occupation and could be accommodated with minimal accommodations" such as the RingG-Pen, tape recorder, and one/two handed combo keyboard.  (Vargo Decl. Ex. 2 at US000201.)

After discussing prior medical information in the file, USIC noted consistent comments of Hudson's treating physicians about the disconnect between Hudson's pain complaints and clinical findings and testing results; the multiple reviews by Drs. Fleeson, Jones, Neubauer, and Siegel that found a lack of documented restrictions apart from exaggerated complaints of pain and that the FCE report was invalid in light of observations from Hudson's treating physicians and contemporaneous surveillance video; and the failure of Drs. Gaenslen and Dhesi to comment on Hudson's restrictions.  (DSPMF ¶ 84.)

33

USIC noted Hudson's additional medical records and questioning of Dr. Siegel's return-to-work date of January 1, 2009. Additionally, USIC described engaging Dr. Gause to address the issues of restrictions beyond January 1, 2009, and summarized his conclusions that as of January 1, 2009, Hudson could function in a light duty capacity; walk, stand, and sit without restrictions; lift and carry twenty pounds occasionally and ten pounds frequently; perform fine motor movement and fingering without restrictions; type or use a computer for at least an hour at a time for a total of five to six hours a day; but she could not grip repetitively or for prolonged periods and should refrain from overhead use of upper extremities. (Vargo Decl. Ex. 2 at US000205.) USIC then commented:

> The Committee considered the letter from Dr. Gaenslen indicating that Ms. Hudson was disabled through August 19, 2009 due to problems with her hands. This opinion differs from Dr. Siegel and Dr. Gause, both of whom found no significant limitations as of January 1, 2009. Both of those reviewers attempted to contact Dr. Gaenslen. However, he refused to return their calls.

> . . . . The Committee noted that there is no evidence in the file that as of 1/1/09 Ms. Hudson was not [sic] taking any pain medications. In addition, The Appeals Committee also noted that Ms. Hudson had inquired about returning to work with Major, Lindsey and Africa in January or February of 2009, however due to downsizing they were unable to hire her back. Based on all of the evidence, the Committee found that Ms. Hudson was capable of performing the duties of her own occupation as of 1/1/2009.

> It is the decision of the Appeals Committee that Ms. Hudson did not satisfy the definition of disability as quoted on page one of this letter as of January 1, 2009. By that date, the evidence supports a finding that Ms. Hudson had the physical and mental capacity to perform her regular occupation on a full time basis. As such, no additional benefits are available. As stated previously, the Appeals Committee is the final administrative remedy available and Ms. Hudson's claim is now closed.

(DSPMF ¶ 85.)

34

The plan administrator did not address Hudson's arguments regarding the surveillance in the March 31, 2010, denial letter or the July 8, 2009, letter. (*See* Olson Aff. Exs. at 133-40, 237-44.)

Hudson's treating physicians and providers diagnosed or confirmed the following conditions: degenerative disc disease; radiculopathy of the cervical spine; myalgia/myositis. (PPFOF ¶ 39; Def.'s Resp. ¶ 39, Olson Aff. Exs. at 57, 132, 183.) Hudson's treating physicians and providers diagnosed or confirmed the following shoulder conditions: left and right shoulder supraspinatus tendon irritation, left shoulder partial thickness rotator cuff tear, and rotator cuff impingement. (PPFOF ¶ 40; Def.'s Resp. ¶ 40; Olson Aff. Exs. at 177-78, 184-85, 187.) One of Hudson's treating physicians diagnosed a "[c]ommon extnesor tendinopathy/partial tear" in her left arm or elbow. (PPFOF ¶ 41; Def.'s Resp. ¶ 41; Olson Aff. Exs. at 175.) Since the disability onset date, Hudson has undergone injections in her neck, shoulders, and elbows due to the pain, including trigger point objections, epidural shots in her neck (C-5), and cortisone shots in her shoulders and left elbow. (PPFOF ¶ 42; Def.'s Resp. ¶ 42.)

The administrative record contains only one opinion of a physician that Hudson lacks capacity to perform occupational duties after January 1, 2009, and that is the opinion of Dr. Gaenslen in his November 17, 2009, letter, which addressed only restrictions to Hudson's right thumb and found that those restrictions ceased as of August 17, 2009. (DSPMF ¶ 73.)

In July 2008 Hudson was taking Percocet/Zanaflex for pain. (Olson Aff. Exs. at 60, 180, 194.) Dr. Dhesi prescribed Oxycodone for Hudson in August 2008. (*Id.* at 195-97.) Hudson was taking Percocet in October 2008, and had prescriptions for Percocet and

35

Oxycodone filled in November 2008. (*Id.* at 222-23, 227.) Hudson was prescribed Percocet in January 2009, and again in December 2009, until February 2010. (*Id.* at 183, 200; *see id.* at 231; PPFOF ¶ 43; Def.'s Resp. ¶ 43.) Drs. Siegel and Neubauer never physically examined Hudson. (*See* Pl.'s Resp. ¶¶ 65, 66.)

To recover benefits in the first instance, Hudson had to be disabled continuously throughout the ninety-day Qualifying Period from her last day worked. This period would extend to October 1, 2007. (DSPMF ¶ 17.)

## STANDARD OF REVIEW

ERISA permits a beneficiary to sue to recover benefits due, enforce her rights, or clarify her right to future benefits under the terms of an employee welfare benefits plan. 29 U.S.C. § 1132(a)(1)(B); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). The court reviews an ERISA case under a de novo standard, unless the benefit plan gives the administrator discretionary authority to determine eligibility or to construe plan terms. *Aetna Health Inc.*, 542 U.S. at 210; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where plan documents contain ambiguous or no language regarding the scope of judicial review, the court reviews de novo the meaning of the ERISA contract and whether the denial of benefits was correct. *Herzberger v. Std. Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000); *see Aetna Health Inc.*, 542 U.S. at 210. Where plan documents clearly confer discretion on a plan administrator to interpret the plan documents or to determine a participant's entitlement to benefits, the court reviews the determination deferentially, setting aside a denial of benefits only if the decision was arbitrary and capricious. *See Herzberger*, 205 F.3d at 329-31.

36

Here, the Policy provides that USIC has "the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determinations and interpretations made by us are conclusive and binding on all parties." (DSPMF ¶ 10.) The parties agree that under this provision USIC had discretion such that the court reviews USIC's decision under the arbitrary and capricious standard. (Pl.'s Br. in Supp. of Mot. for Summ. J. at 2; Defs.' Mem. of Law in Opp'n at 7.)

Arbitrary-and-capricious review is deferential but not a rubber stamp. *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009). A plan administrator's decision must comply with ERISA's requirements that specific reasons for denial be given to the claimant and the claimant be afforded the opportunity for a full and fair review by the administrator. *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 831, 832-33 (7th Cir. 2009). In addition, the court will not uphold a denial when the record shows an absence of reasoning to support the plan's decision, *id.*; *Love*, 574 F.3d at 396, or the administrator fails to address any reliable evidence of eligibility put forward by the claimant, *Love*, 574 F.3d at 396. Bare conclusions are not a sufficient rationale for decision. *Id.* at 397. And selective reading of the evidence is a hallmark of an arbitrary and capricious decision. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010).

Where a single entity administers the plan and pays benefits out of its pocket, the dual role constitutes a conflict of interest that the court must consider (along with all other factors) in deciding whether the denial of benefits was arbitrary and capricious. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *Leger*, 557 F.3d at 830-31. The significance of such a conflict depends on the circumstances of the case. *Metro. Life Ins. Co.*, 554 U.S.

37

at 108. It is not the existence of the conflict of interest, but the gravity of the conflict (i.e., the likelihood that it influenced the decision) that is critical. *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009).

Payment of benefits under an initial determination is evidence that the plan administrator believed, at least initially, that the claimant was disabled as defined in the plan and is another factor to be considered by the court. However, it does not create any presumption that benefits must continue or burden for the administrator to overcome. *Leger*, 557 F.3d at 832.

That an administrator's decision rests on an opinion of a doctor who conducted a medical file review rather than a physical examination creates no presumption of arbitrariness or capriciousness. *Leger*, 557 F.3d at 832. Nothing prohibits the commonplace practice of obtaining a medical opinion based on review of medical files:

> In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006).

A decision at odds with the opinion of a treating physician carries no presumption of arbitrariness or capriciousness. *Leger*, 557 F.3d at 832. The opinions of treating physicians do not deserve special weight or consideration in benefits determinations, and plan administrators are not required to explain why they credit other reliable evidence over conflicting evidence from a treating physician. *Id.* Nevertheless, a failure to address

38

treating physician findings contrary to the administrator's decision may constitute a failure to provide a reasonable explanation. *See Love*, 574 F.3d at 397.

"[C]omplaints of pain cannot be dismissed out of hand because they are subjective." *Leger*, 557 F.3d at 834. A plan must explain why it finds complaints of pain unreliable or why, if the complaints are reliable, the pain is not completely debilitating. *See id.* at 835. Further, a distinction exists between the amount of pain a claimant experiences, which is subjective, and how much an individual's degree of pain limits her functional capacity, which can be measured objectively. *Holmstrom*, 615 F.3d at 770. If the court finds a denial of benefits to have been arbitrary and capricious it may remand the case to the administrator for further proceedings or reinstate benefits. *Leger*, 557 F.3d at 834.

DISCUSSION

Hudson contends that her recovery from the November 17, 2008, surgery; her neck, back, shoulder and elbow conditions; and the pain caused by those conditions, prevent her from being able to perform the material duties of her regular occupation. (PPFOF ¶¶ 45, 46.) She believes that the Plan administrator ignored clear medical evidence of her medical conditions and disability in denying her claim under the Plan and that defendants arbitrarily and capriciously refused to provide her benefits pursuant to the Plan and ERISA.[8] (PPFOF ¶¶ 47-48.) However, the undisputed facts show that USIC did not act arbitrarily or capriciously when it denied Hudson benefits as of January 1, 2009. The court has reviewed the above facts and the administrative record and finds that USIC's final denial must be upheld under the deferential standard.

---

[8]Hudson does not argue that USIC's description of her material job duties was incorrect.

39

In no way did USIC give Hudson's claim short shrift. Hudson appealed the denial of benefits twice, and in the first appeal USIC revised its initial denial as of August 31, 2008, and extended benefits through December 31, 2008. Hudson was permitted to submit substantial medical records before the initial denial, between that denial and the decision on the first appeal, and again between that decision and the final denial. Further, she submitted lengthy appeal letters. Moreover, Hudson does not contend that she was unable to submit all documentation that she desired. As far as the submission of documentation and argument go, Hudson was given a full hearing on her claim.

In addition, USIC had three doctors—its consultant, Dr. Fleeson, during the initial review stage; independent reviewer Dr. Siegel after the first appeal, and independent reviewer Dr. Gause after the second appeal—review her medical file and provide their medical opinions. Also, USIC had two of its staff psychologists—Drs. Jones and Neubauer—review Hudson's behavioral or mental health records. These doctors and psychologists reviewed Hudson's file and provided lengthy reports and sometimes several addendums to their reports after the review of additional materials submitted by Hudson. In addition, USIC obtained an FCE report and a surveillance report. It did not deny Hudson's claim based on a slim file but instead ordered extensive reviews of a substantial file by medical and vocational professionals.

The decisions on the first and second appeals were not blind denials. They discussed in detail the appropriate Policy provisions, Hudson's occupational duties, medical records, and, importantly, the various reviewing doctors' reports as well as addendums and the surveillance evidence.

40

Hudson contends that the letters denying her appeals neglected to address her arguments regarding the surveillance videos and problems with the reviewing doctors' opinions. Regardless, a failure by USIC to address every argument Hudson raised does not mean its decisions were arbitrary or capricious. Here, USIC considered the evidence and provided reasoning to support its decision.

The denials of both appeals contain sufficient reasoning to be upheld under the deferential arbitrary-and-capricious standard. Each of the decisions described Hudson's medical records and referenced the opinions of the doctors who reviewed the medical file. USIC's decision was not arbitrary and capricious simply because those doctors' opinions contradicted Dr. Gaenslen's November 2009 letter. Dr. Siegel did not have the benefit of the letter that postdated his file review, while Dr. Gause did. Yet both doctors opined independently that Hudson was capable of work as of January 1, 2009.

Hudson argued in one of her appeal letters that Dr. Siegel did not explain how he arrived at that date, yet Dr. Gause arrived at the same date. Moreover, Dr. Siegel indicated that he based his opinion on various standard textbooks of rehabilitation medicine. (Vargo Decl. Ex. 5 at US000745.) Thus, USIC's reliance on independent reviews by Drs. Siegel and Gause was reasonable and provided a sufficient basis for the denial of Hudson's claim.

USIC did not consider only the evidence in its favor selectively, but assessed contrary evidence such as the FCE and Dr. Gaenslen's opinion and explained why it discounted that evidence. It described why it discounted the FCE report considering surveillance videos before and after the FCE.

41

Having viewed the surveillance videos, the court agrees that USIC reasonably rejected the FCE report on the basis of the surveillance videos. The video from July 1, just a few weeks before the FCE, shows a woman who could sit for over thirty minutes on a hard gym floor with little to no indication of an issue with either hand or any other body part. Yet at the FCE Hudson could not hold her head up, could not tolerate sitting up, had to rest, had difficulty grasping, and complained of a new ailment with her left hand. Although the video from the afternoon after the FCE shows Hudson wearing a splint (supporting her argument that she suffered right hand or wrist pain), it also discloses Hudson driving on the very same day she said someone else had to drive her to the FCE.

Hudson argued to USIC that her behavior in the videos could be explained—that she had steroid injections in June and July 2008, which improved her condition temporarily; that the videos do not show whether she had to rest as soon as she went inside her house; that dialing a number on a cell phone is much different from typing or handwriting for three hours. The denial letters sufficiently described USIC's reasonable conclusion that the FCE did not portray Hudson's condition accurately. The surveillance videos, referenced in detail by USIC and the doctors who reviewed Hudson's file after July 2008, validly discounted the FCE and Hudson's reports of pain. However, this court's role is not to determine the evidence de novo and reject the surveillance footage as a result. Instead, it is to determine whether USIC's interpretation of the events shown on the footage is supported, and it is.

Although medical records suggested Hudson had neck and back issues, the court cannot call arbitrary or capricious USIC's conclusion that the records failed to show those conditions to be disabling. Apparently, Hudson did not stop working because of those issues, but only stopped working because of abdominal pain and her hand surgery issues.

42

Dr. Siegel reviewed the submitted medical records regarding those conditions and did not find them to be disabling. Dr. Gause reviewed even more medical records from Drs. Daley, Dhesi, and Gaenslen, including Dr. Gaenslen's records from 2008 through November 27, 2009. Even upon review of those records, Dr. Gause opined that Hudson could return to work as of January 1, 2009, and USIC was entitled to rely on that opinion.

Hudson contends that medical records (such as Dr. Crimmins') during the period of time that benefits were awarded are irrelevant. The court disagrees and finds that medical records predating an initial award of disability benefits and spanning the time from the award of benefits until the decision to terminate them are indeed relevant. *See Leger*, 557 F.3d at 833. Moreover, Hudson relies on medical evidence from those time periods, such as Dr. Keppel's statement to Dr. Jones indicating that she believed Hudson was suffering from pain.

Hudson contends that USIC failed to adequately address Dr. Gaenslen's November 2009, letter opining that Hudson was disabled until mid-August 2009. USIC's final denial letter indicated that the appeals committee considered Dr. Gaenslen's November 2009, letter. Although USIC did not discuss Dr. Gaenslen's opinion in detail, it pointed out that the opinion differed from those of Drs. Siegel and Gause and that Hudson had inquired about returning to work with Major Lindsey in January or February of 2009, suggesting she was capable of performing the duties of her occupation in early 2009. Dr. Gause's report, to which USIC referred, noted that Dr. Gaenslen's postoperative reports in February and April 2009 showed "a good wrist and thumb exam," and Hudson's testing was "positive for pain," but "negative for weakness." Dr. Gause also cited similar test results of "negative for weakness" from Dr. Gaenslen in November 2009. (DSPMF ¶ 77.) While additional

43

discussion of Dr. Gaenslen's letter and further contrast of it with other evidence might have been preferable, the final denial letter discussed sufficient evidence that contradicted Dr. Gaenslen's opinion. USIC was not required to give presumptive weight Dr. Gaenslen's opinion; treating physician reports are not given presumptive weight in ERISA cases. And it is not this court's position to determine which doctor was correct.

Hudson submits that the USIC administers the Plan under a structural conflict of interest. (PPFOF ¶ 49.) The court agrees and has considered that as a factor that has to be evaluated. However, that conflict of interest, even in conjunction with other factors, does not require any finding of arbitrariness or capriciousness.

Here, notwithstanding its conflict of interest, USIC paid Hudson benefits in late 2007 and early 2008 even though it believed liability was unclear and questioned whether Hudson suffered any disability between her last day of work on July 2, 2007, and her first hand surgery two weeks later. Then, even though USIC had terminated benefits as of August 31, 2008, it revised that decision and extended benefits through December 31, 2008, because of Hudson's third hand surgery, even though surveillance videos and Dr. Crimmins' records suggested that a third surgery was not necessary and that Hudson was no longer disabled. Several times when Hudson's claim and documentation were reviewed, USIC postponed a final decision to allow for additional review of all records by consulting and independent physicians. In short, USIC's conflict of interest does not appear to have come into play at all.

This case comes down to the standard of review. Hudson relies on her hand surgeries, Dr. Gaenslen's letter, the FCE, the fact that she went to occupational therapy through March 2009, and various medical records showing that she had issues with her

44

neck and other body parts and continuing complaints of pain. But other treating physician records, the surveillance evidence, the reviewing doctors' reports, Hudson's inquiry about returning to Major Lindsey in early 2009, and Hudson's work in her new business supported USIC's decision. USIC provided Hudson with numerous opportunities to submit her medical records and affidavits over the course of two years, and had Hudson's file reviewed by several doctors. USIC's denials were not conclusory, and were based on all of the evidence in the file rather than selective evidence in its favor. Here, deferential review means that USIC's decision must be upheld.

The court does not suggest that Hudson did not experience pain or that she was intentionally exaggerating her pain. Instead, what the court finds is that USIC reasonably and sufficiently considered the record and determined that Hudson was not precluded from working based on her condition. And with the deferential review that must be given USIC's decision, such reasonable consideration is enough.

## CONCLUSION

For the above reasons, Hudson's motion for summary judgment (Doc. 16) was denied, and defendants' motion for summary judgment (Doc. 29) was granted. Therefore,

IT IS ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 3rd day of October, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

45